UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| United States of America, | Criminal No. 06-143 (RHK/FLN) |
| Plaintiff, | |
| v. | **REPORT AND RECOMMENDATION** |
| John Jacob Williams, | |
| Defendant. | |

Andrew R. Winter, Assistant United States Attorney, for the Government.
John S. Hughes, Esq., for Defendant.

___

**THIS MATTER** came before the undersigned United States Magistrate Judge on February 15, 2007, on Defendant's motion to dismiss as the result of Speedy Trial Act violation [#44][1] and Defendant's motion to suppress [#53]. At the hearing on these matters, the Court received testimony from Minneapolis Police Officer Bart Hauge, Former Minneapolis Police Lieutenant Michael Carlson, and Saint Paul Police Officer Timothy McCarty. The Court received two exhibits during this hearing. Government's Exhibit number one is a copy of a supplemental police report compiled by Sergeant Patrick King. Government's Exhibit number two is a copy of the application and affidavit in support of a search warrant issued for a residence in Saint Paul, Minnesota. These

---

[1] In this motion Defendant argues that the Speedy Trial Act was violated in his case because the indictment against Defendant was not filed within thirty days after the date of his arrest. *See* 18 U.S.C. § 3161. At the hearing on these matters, the Court asked the parties to provide supplemental memoranda that addressed all of the outstanding issues in this case. Defendant submitted such a memorandum; however, Defendant's memorandum made no mention of a violation of the Speedy Trial Act. Since Defendant did not address the alleged Speedy Trial Act violation in his supplemental memorandum, the Court assumes that this argument has been abandoned. Therefore, the Court recommends that Defendant's motion to dismiss as the result of Speedy Trial Act violation [#44] be **DENIED**.

matters were referred to the undersigned for Report and Recommendation pursuant to 28 U.S.C. § 636 and Local Rule 72.1. For the reasons which follow, this Court recommends that Defendant's motion to dismiss as the result of Speedy Trial Act violation [#44] and Defendant's motion to suppress [#53] be **DENIED**.

## I. FINDINGS OF FACT

Minneapolis Police Officer Bart Hauge (hereinafter referred to as "Officer Hauge") is a member of the Violent Offender Task Force (hereinafter referred to as "Task Force"). The Task Force investigates narcotics trafficking. Officer Hauge conducted an investigation into a narcotics trafficking operation throughout 2005 and 2006. During this investigation Officer Hauge developed two separate confidential informants (hereinafter referred to as "CI number one" and "CI number two"). CI number one and CI number two were both arrested separately for narcotics violations. Both CI's agreed to cooperate with Officer Hauge after their respective arrests, and both of the CI's named "Jelly" or "Big John" as their narcotics source. Officer Hauge showed each CI a photograph of Defendant and both CI's confirmed that Defendant was the person known to them as "Big John" or "Jelly."

CI number one informed Officer Hauge that Defendant was his narcotics source and was known to CI number one as "Jelly" or "Big John." CI number one informed Officer Hauge that Defendant was involved in a narcotics trafficking operation to traffic cocaine from Chicago, Illinois, to Minnesota. Officer Hauge knew that Defendant had ties to Chicago because Officer Hauge was involved in a 2005 case where Defendant was implicated for receiving narcotics from contacts in Chicago. CI number one further informed Officer Hauge that, as part of the narcotics trafficking operation, a person known as "Turk" drove a grey mini van from Chicago to Minnesota to transport

2

the narcotics and that "Turk" would use the same grey mini van to transport money from Minnesota to Chicago. CI number one informed Officer Hauge that the grey mini van had a hiding spot in the back where the narcotics and money were hidden during transport. CI number one took Officer Hauge to the residence where the cocaine was delivered and to an address where CI number one stated that the money involved in the narcotics trafficking operation was kept. That residence was a residence on Hyacinth Avenue in Saint Paul, Minnesota. This address was the known residence for Defendant. (Ex. 1 at 1.)

Officer Hauge conducted surveillance on the Hyacinth residence and this surveillance showed Defendant coming and going from the residence. Officer Hauge also observed a grey mini van at the Hyacinth address during this surveillance. The grey mini van had Illinois license plates and further investigation revealed that the grey mini van was registered to Jonathan Legit. Officer Hauge received a copy of the drivers license photograph of Jonathan Legit and showed it to CI number one. CI number one identified Jonathan Legit as the person he knew as "Turk."

In early March 2006, CI number one informed Officer Hauge that Defendant had just received a shipment of narcotics from Chicago. Officer Hauge set up surveillance at the Hyacinth address and instructed CI number one to place a telephone call to Defendant to order a quantity of narcotics. CI number one had Defendant's cellular telephone number and placed a call to Defendant on February 22, 2006. CI number one again called Defendant on March 6, 2006, and during the last telephone call Defendant told CI number one "have your people call my people."

Officer Hauge then elicited the assistance of CI number two. CI number two called Defendant at the cellular telephone number used by CI number one. CI number two placed this call from CI number two's cellular telephone. Officer Hauge testified that the telephone number that

both CI number one and CI number two called was registered to a person named Andre Rufus, who was deceased at the time of this investigation. Officer Hauge was present during this telephone call and the call was recorded. CI number two asked for "Big John" and the person who answered the telephone stated "it's me." CI number two then stated "I need a couple of 252's" which, according to Officer Hauge, translated to a request for two nine ounce packages of cocaine. To this request Defendant responded "which way" and CI number two responded "half and half." Officer Hauge testified that this meant that CI number two was requesting that the purchase be split equally between cocaine and crack-cocaine. Defendant responded by telling CI number two to head into Saint Paul.

Officer Hauge testified that he instructed CI number two to prolong the meeting in Saint Paul and to tell Defendant that CI number two wanted to wait for rush hour traffic to subside before driving to Saint Paul. An hour and a half later CI number two called Defendant and was instructed to take Interstate 94 into Saint Paul, to exit at Lexington Avenue and to go through the red light and park at the Park. Although Defendant did not name the Park, Officer Hauge testified that he was familiar with the area and the only park in the vicinity was Oxford Park. Officer Hauge instructed other officers, including then Lieutenant Michael Carlson, to set up roaming surveillance around Oxford Park. Another officer involved in the surveillance was Sergeant Patrick King (hereinafter referred to as "Sergeant King"), Officer's Hauge's supervisor in the Task Force.

CI number two never approached the area of Oxford Park, but CI number two engaged in a series of telephone calls with Defendant attempting to get Defendant to reveal which vehicle he was in. Defendant did not do so. During these calls CI number two described the vehicle he was supposedly in as a vehicle similar to the decoy vehicle Sergeant King was located in. Sergeant

King's vehicle was parked near the park. Officer Hauge testified that the surveillance officers informed him that at the time the surveillance was conducted, around seven at night, there was not any traffic around Oxford park. Since there was little to no vehicular traffic around the park, the surveillance officers were having a hard time locating Defendant's vehicle, which they believed was parked nearby. (Ex. 1 at 1.) Sergeant King told Officer Hauge to have CI number two tell Defendant that CI number two was at the intersection of Concordia Avenue and Oxford. (Ex. 1 at 1.) Sergeant King's undercover decoy vehicle was parked on the south side of Concordia Avenue, just east of Oxford. (Ex. 1 at 1.) Concordia Avenue is a one way street, and Sergeant King was set up to monitor the intersection of Concordia Avenue and Oxford for the possible arrival of Defendant. (Ex. 1 at 1.)

Sergeant King stated in his supplemental report that almost immediately after he relocated to that position he observed a newer model dark grey Chevrolet Impala[2] (hereinafter referred to as "the Impala") pull up to the intersection of Concordia Avenue and Oxford. (Ex. 1 at 1.) The Impala was northbound on Oxford, turned partially onto Concordia and when it stopped the vehicle was facing in a northeasternly direction. (Ex. 1 at 1.) Sergeant King stated in his supplemental report that the Impala appeared to be occupied by four people. (Ex. 1 at 1.) There was no other vehicle traffic on Concordia or Oxford, and the Impala appeared to be stopped, waiting for someone or something. (Ex. 1 at 1.) After being stopped for approximately fifteen seconds, the vehicle slowly rounded the corner eastbound on Concordia Avenue and drove by the decoy vehicle slowly. (Ex. 1 at 1.) Sergeant King observed the Impala proceed eastbound on Concordia, one block to

---

[2]Officer Hauge testified that Defendant was never seen riding in the Impala during the surveillance on the Hyacinth Avenue address and there was no information that the Impala was registered to Defendant.

5

Chatsworth, and then it turned south on Chatsworth. (Ex. 1 at 1.) Sergeant King relayed this information to the rest of the surveillance team. (Ex. 1 at 1.) The surveillance team informed Sergeant King that the vehicle turned westbound on Carroll, then turned northbound on Oxford and was again approaching the intersection of Concordia Avenue and Oxford. (Ex. 1 at 1.) At that point Sergeant King observed the same Impala pull up to the intersection of Concordia Avenue and Oxford. (Ex. 1 at 1.) The vehicle stopped while facing in a northeasterly direction for a second time. (Ex. 1 at 1.) Sergeant King informed the surveillance officers that the vehicle was still occupied by four people and that he could also see what appeared to be a large black male in the rear passenger side of the vehicle talking on a cellular telephone. (Ex. 1 at 1.) Sergeant King determined that the black male was speaking on the cellular telephone because he observed the blue green illumination of the cellular telephone as it was held up to the person's face. (Ex. 1 at 1.) At that point Officer Hauge informed Sergeant King that CI number two was currently on the phone with Defendant. (Ex. 1 at 1.)

  Officer Hauge testified that Sergeant King was familiar that Defendant was a large black male, and that Defendant was six foot one inch in height and weighed approximately 300 pounds at the time of his arrest. Officer Hauge further testified that Sergeant King stated that there were women in the Impala, and Officer Hauge stated that he heard women on the other end of the telephone call between CI number two and Defendant; however, Sergeant King's supplemental report does not contain any reference to observing women in the vehicle. The sole reference to the gender of any persons in the vehicle relates to the large black man Sergeant King observed in the back of the Impala. Lieutenant Carlson was also driving in the same area and spotted the Impala from behind with four occupants, one of which was a large person in the right rear seat of the

vehicle.

There was no other traffic on Concordia Avenue or Oxford when the Impala pulled up to the intersection. The Impala stopped again at this intersection for approximately fifteen seconds. (Ex. 1 at 2.) After approximately fifteen seconds the vehicle slowly rounded the corner eastbound on Concordia Avenue and drove eastbound at a high rate of speed. (Ex. 1 at 2.) Sergeant King relayed this information to the surveillance officers. (Ex. 1 at 2.)

At this point the surveillance officers and Officer Hauge believed that the male in the back passenger seat of the Impala who was speaking on the cellular telephone was Defendant. (Ex. 1 at 2.) The officers involved believed that Defendant was now suspicious of the situation and was attempting to flee the area. (Ex. 1 at 2.) At that point Officer Hauge made the decision to have the surveillance officers stop the Impala.

Lieutenant Carlson, Sergeant King and Officer Doran all used their vehicles to create a box around the Imapla so that neither the vehicle nor its occupants could escape being stopped by police. (Ex. 1 at 2.) Sergeant King immediately exited his vehicle and ordered the driver of the Impala to turn off the engine. (Ex. 1 at 2.) The driver and front seat passenger were thereafter ordered out of the vehicle and those occupants, two women, complied. Next the passenger behind the driver's seat was ordered out of the vehicle, and that person, who was also a woman, complied. Lieutenant Carlson then walked up to the drivers side rear door and looked inside the vehicle. Lieutenant Carlson testified that he had previously been shown a photograph of "Jelly" and he immediately recognized the back seat passenger as the person known as "Jelly." Lieutenant Carlson had his gun drawn as he approached the vehicle, and upon approaching he immediately observed a gun on the seat approximately two to three inches from Defendant's hand. Lieutenant Carlson ordered

7

Defendant to put his hands on the back of the front passenger seat and then removed the gun from the vehicle. He then removed Defendant from the vehicle and at that time Defendant said "it's mine, not the girls'" in reference to the firearm. Once Defendant was removed from the vehicle he told Lieutenant Carlson "I have dope in my pocket" and he indicated that the narcotics were in his right front pocket. Lieutenant Carlson testified that he did not do or say anything to elicit either of these statements from Defendant. Lieutenant Carlson testified that he did not have gloves on at that time so he solicited the assistance of another officer to extract the narcotics from Defendant's right front pocket.

After Defendant was searched at the scene he was placed in Sergeant King's undercover vehicle and was driven to the Ramsey County Law Enforcement Center. Officer Hauge arrived at the Law Enforcement Center within minutes of Sergeant King arriving there with Defendant. At that point Officer Hauge began to interview Defendant. Officer Hauge testified that he began the interview by administering the entire Miranda warning from memory. The first time Officer Hauge attempted to administer the Miranda warning, Defendant interjected, stating that he knew the rights already. Officer Hauge informed Defendant that he was required by law to read the Miranda rights and then proceeded to recite the Miranda rights from the beginning a second time. Lieutenant Carlson and Saint Paul Police Officer Timothy McCarty (hereinafter referred to as "Officer McCarty") were present when Officer Hauge administered the Miranda warning from memory. Defendant stated that he understood his rights and Officer Hauge testified that Defendant appeared to understand his rights. Officer McCarty testified that Defendant appeared to understand his rights, he was cooperative and he never asked for an attorney while Officer McCarty was in the room. Officer Hauge testified that Defendant did not appear to be under the influence of any alcohol or

narcotics and that his demeanor was calm and cooperative. Officer Hauge testified that Defendant never asked for an attorney and never asked to terminate the interview. Officer Hauge testified that the interview lasted at least one hour. Officer Hauge did not record the interview; however, both he and Officer McCarty took notes during the interview. During the interrogation of Defendant, Officer McCarty and Lieutenant Carlson came in and out of the interview room. Officer Hauge testified that Defendant discussed a wide variety of narcotics related subjects during the interview and that the interview concluded when Officer Hauge ran out of questions to ask Defendant. At the conclusion of the interview Defendant was booked into the Ramsey County Jail. Officer McCarty was the affiant for the search warrant of the Hyacinth Avenue residence which was admitted into evidence as Exhibit number two.

Defendant now moves to suppress the evidence obtained as a result of the vehicle stop. Defendant argues that the officers who stopped the vehicle did not have probable cause to support the stop and that all the evidence seized as a result of the stop should be suppressed. The Government opposes Defendant's motion to suppress.

## II. CONCLUSIONS OF LAW

**A.      The Initial Stop of the Vehicle Was Supported By Reasonable, Articulable Suspicion.**

"An investigatory stop is considered a seizure within the meaning of the Fourth Amendment and must be 'supported by reasonable suspicion to believe that criminal activity is afoot.'" *United States v. Ameling*, 328 F.3d 443, 447 (8th Cir.2003)(quoting *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). "An investigative stop of a vehicle does not violate the Fourth Amendment where the police have a reasonable suspicion that the occupant of the vehicle is engaged in criminal activity." *United States v. Jacobsen*, 391 F.3d 904, 906 (8th Cir.2004); *see also Florida v. J.L.*, 529 U.S. 266,

271 (2000) ("[t]he reasonableness of official suspicion must be measured by what the officers knew before they conducted their search.") "Whether the particular facts known to the officer amount to an objective and particularized bases for a reasonable suspicion of criminal activity is determined in light of the totality of the circumstances." *United States v. Garcia*, 23 F.3d 1331, 1334 (8th Cir.1994).

Reasonable suspicion is "a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, [however,] the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000) (citing *United States v. Sokolow*, 490 U.S. 1, 7 (1989)). In order to establish reasonable suspicion, an "officer must be able to articulate more than an 'inchoate and unparticularized suspicion or hunch' of criminal activity." *Wardlow*, 528 U.S. at 123-24 (quoting *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). To establish reasonable suspicion "an officer may rely on information provided by other officers and all the information known to a team of officers involved in the investigation to provide justification for a stop." *United States v. Ortiz-Monroy*, 332 F.3d 525, 529 (8th Cir.2003).

In the present case the investigating officers possessed reasonable, articulable suspicion that Defendant was an occupant of the Impala and that Defendant was engaged in narcotics trafficking activity at the time the Impala was stopped. Officer Hauge conducted an extensive investigation into Defendant's activities prior to the date of the stop. Officer Hauge received information from two separate confidential informants that a person known as "Jelly" or "Big John" was involved in the distribution of narcotics. Officer Hauge confirmed that the person known as "Jelly" or "Big John" was, in fact, Defendant, as both CI's identified Defendant from a photograph. CI number one

provided Officer Hauge with details concerning Defendant's narcotics trafficking operation, including the fact that Defendant received his narcotics from Chicago by way of a grey mini van driven by a man named "Turk" and the address on Hyacinth Avenue in St. Paul where the money involved in the transactions was kept.

Officer Hauge partially corroborated the information provided by CI number one. Officer Hauge was aware that Defendant had ties to Chicago, based on a previous investigation in 2005. In addition, Officer Hauge conducted surveillance on the Hyacinth address and observed Defendant coming and going from the residence. During this surveillance Officer Hauge also observed a grey mini van in the driveway with Illinois license plates. Officer Hauge obtained the drivers license photograph of the registered owner of the grey mini van and upon showing this photograph to CI number one, CI number one identified the registered owner was the man the CI knew as "Turk."

After corroborating this information CI number one informed Officer Hauge in early March that Defendant had just received a shipment of narcotics from Chicago. Officer Hauge then instructed CI number one to call Defendant to attempt to place an order for narcotics. CI number one's attempts were ultimately unsuccessful; however, Defendant told CI number one to "have your people call my people." In response to this direction Officer Hauge enlisted the assistance of CI number two. CI number two utilized the same cellular telephone number that was utilized by CI number one to contact Defendant. CI number two asked for "Big John" and the person who answered the phone responded "it's me." CI number two then ordered one nine ounce package of cocaine and one nine ounce package of crack-cocaine from Defendant. An hour and a half after placing this order, CI number two called Defendant back on the same cellular telephone number and

was instructed to take Interstate 94 into Saint Paul, to exit at Lexington Avenue and to go through the red light and park at the Park. Although Defendant did not name the Park, Officer Hauge testified that he was familiar with the area and the only Park he knew of in that location was Oxford Park. Therefore, Officer Hauge instructed surveillance teams to position themselves in the vicinity of Oxford Park.

CI number two, at Officer Hauge's direction, then engaged in a series of telephone calls with Defendant in an attempt to get Defendant to reveal his location. During these calls CI number two described to Defendant the vehicle he was supposedly in and this description was that of a vehicle similar to the decoy vehicle that Sergeant King was located in. At the time CI number two was describing his "location" to Defendant, it was approximately seven o'clock in the evening, and surveillance officers noted that there was little to no vehicular traffic around the park. Sergeant King then directed Officer Hauge to instruct CI number two to inform Defendant that CI number two was located at the intersection of Concordia Avenue and Oxford. At that time Sergeant King's decoy vehicle was parked on the south side of Concordia Avenue, just east of Oxford. Almost immediately after CI number two relayed this information to Defendant, Sergeant King observed the Impala pull up to the intersection of Concordia Avenue and Oxford. At this time there was no other vehicle traffic on Concordia and Oxford. The Impala stopped for approximately 15 seconds, apparently waiting for something or someone. Then the Impala slowly rounded the corner and drove by the decoy vehicle. The Impala was then observed driving around the block and again approached the intersection of Concordia Avenue and Oxford. Sergeant King again observed the same Impala stopped at the corner for approximately fifteen seconds. During this time Sergeant King observed that there were four passengers in the vehicle and that the passenger in the rear passenger side of the

vehicle was a large black male who was talking on a cellular telephone. Sergeant King was familiar with Defendant's physical appearance and knew him to be a large black male. Sergeant King determined that the large black male was speaking on a cellular telephone because he observed the blue green light of a cellular telephone as it was held up to the man's face. Officer Hauge further testified that Sergeant King identified the other occupants of the Impala as females, and Officer Hauge stated that he overheard the voices of women on the other end of the telephone call between CI number two and Defendant. At the time Sergeant King observed the large black male on the cellular telephone and relayed this information to Officer Hauge, CI number two was speaking with Defendant on his cellular telephone.

After being stopped for approximately fifteen seconds at the corner, the Impala slowly rounded the corner and then accelerated to a high rate of speed. At that point, looking at the totality of the circumstances, Officer Hauge possessed reasonable suspicion to believe that the large black male in the back passenger seat of the Impala who was speaking on the cellular telephone was Defendant, and that Defendant was currently engaged in the criminal activity of narcotics trafficking by attempting to deliver narcotics to CI number two. Officer Hauge made the decision to order the surveillance officers to stop the vehicle based on this reasonable suspicion. Once the vehicle was stopped and Lieutenant Carlson walked up to the drivers side rear door he looked into the backseat and immediately recognized Defendant as the person known as "Jelly." At that point the reasonable suspicion that existed to support the initial stop blossomed into probable cause.

"Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Illinois v.*

*Gates*, 462 U.S. 213, 236 (1983)). Once Lieutenant Carlson positively identified the occupant of the Impala as Defendant, looking at the totality of the circumstances, a reasonable person could believe that there was a fair probability that evidence of narcotics trafficking would be found in Defendant's vicinity.

Furthermore, at the time Lieutenant Carlson recognized Defendant he also observed a firearm on the back seat approximately two to three inches away from Defendant. The plain view doctrine states that "police may seize an object without a warrant if '(1) the officer did not violate the Fourth Amendment in arriving at the place from which the evidence could be plainly viewed, (2) the object's incriminating character is immediately apparent, and (3) the officer has a lawful right of access to the object itself.'" *United States v. Collins*, 321 F.3d 691, 694 (8th Cir.2003). As discussed above, the initial stop of the Impala was valid based on reasonable suspicion; therefore, Lieutenant Carlson did not violate the Fourth Amendment in arriving at the door of the Impala from which the firearm could be plainly viewed. The firearm's incriminating character was immediately apparent and the officer had a lawful right of access to the firearm. Therefore, the plain view doctrine further supports the conclusion that the reasonable suspicion that supported the initial stop blossomed into probable cause when Lieutenant Carlson observed Defendant, and the firearm, through the drivers side rear door. Since the stop was supported, first by reasonable suspicion and then by probable cause, the evidence obtained as a result of the stop, including all the subsequent statements Defendant made to law enforcement, is admissible.

  **B.**  **Defendant's Motion to Suppress the Statements He Made in Connection With This Case Should Be Denied.**

In his supplemental memorandum in support of his motion to suppress, Defendant argues that his statements must be excluded as the fruit of the unlawful stop of the Impala. (Def.'s Mem. at 5.)

In addition, Defendant argues that his statement must be suppressed because the statement was taken without the benefit of a *Miranda* warning. (Def.'s Mem. at 6.) Finally, Defendant argues that the search warrant that was subsequently issued for the Hyacinth address was illegally obtained, as it was obtained as a result of Defendant's illegally obtained statement. (Def.'s Mem. at 7.) Defendant argues that all of the evidence gathered as a result of the execution of the illegally obtained search warrant must be excluded. (Def.'s Mem. at 7.)

At the hearing on these matters, Defendant's counsel withdrew his motion to suppress Defendant's statement insofar as it was based on an argument that the statement was taken in violation of *Miranda*. However, Defendant's counsel stated that he would continue to move to suppress Defendant's statement on the grounds that the statement was the fruit of an unlawful stop. Therefore, since Defendant withdrew his suppression motion based on the allegation of a *Miranda* violation, the Court will not entertain Defendant's argument that his statement was taken in violation of *Miranda*.[3] As to Defendant's remaining arguments, all of these arguments are based on the premise that the initial stop was illegal. As concluded above, the initial stop was supported by reasonable suspicion which turned into probable cause once Lieutenant Carlson identified Defendant and observed the firearm located next to Defendant. Since the initial stop was valid, Defendant's subsequent statements were not the fruit of an unlawful stop, and are therefore admissible. Since Defendant's statements were not the fruit of an unlawful stop, they were properly used to obtain the search warrant issued in the present case and any evidence seized during the execution of that search warrant is admissible. Therefore, the Court recommends that Defendant's motion to suppress [#53]

---

[3] While Defendant claims in his memoranda that "he was not read his *Miranda* rights prior to his statement,"(Def.'s Mem. at 6) Officer Hauge testified that he did advise Defendant of his *Miranda* rights, and there was no evidence to the contrary offered at the hearing.

be **DENIED**.

## III. RECOMMENDATION

Based upon all the files, records and proceedings herein, **IT IS HEREBY RECOMMENDED** that Defendant's motion to dismiss as the result of Speedy Trial Act violation [#44] be **DENIED** and that Defendant's motion to suppress [#53] be **DENIED**.


DATED: March 8, 2007                              s/ *Franklin L. Noel*
                                                  FRANKLIN L. NOEL
                                                  United States Magistrate Judge


Pursuant to the Local Rules, any party may object to this Report and Recommendation by filing with the Clerk of Court and serving on all parties, on or before **March 27, 2007**, written objections which specifically identify the portions of the proposed findings or recommendations to which objection is being made, and a brief in support thereof. A party may respond to the objecting party's brief within ten days after service thereof.  All briefs filed under the rules shall be limited to 3,500 words. A judge shall make a de novo determination of those portions to which objection is made.

Unless the parties are prepared to stipulate that the District Court is not required by 28 U.S.C. § 636 to review a transcript of the hearing in order to resolve all objections made to this Report and Recommendation, the party making the objections shall timely order and cause to be filed by **March 27, 2007** a complete transcript of the hearing.

This Report and Recommendation does not constitute an order or judgment of the District Court, and it is, therefore, not appealable to the Circuit Court of Appeals.